3 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**HONEYWELL INTERNATIONAL INC., _et al.,_**

      _Plaintiffs,_

      v.

**ITT INDUSTRIES, INC., _et al.,_**

      _Defendants._

                        /

**HONORABLE AVERN COHN**

**CASE NO. 02-73948**

**FILED**

MAR 10 2004

CLERK'S OFFICE
U. S. DISTRICT COURT
EASTERN MICHIGAN

R. TERRANCE RADER    (P28747)
GLENN E. FORBIS, P.C.    (P52119)
KRISTIN L. MURPHY    (P57284)
**RADER, FISHMAN & GRAUER PLLC**
39533 Woodward Avenue, Suite 140
Bloomfield Hills, Michigan 48304
(248) 594-0600

_Attorneys for Plaintiffs Honeywell
International Inc. and Honeywell
Intellectual Properties Inc._

THOMAS N. YOUNG (P22656)
AMANDA CONTI DUHAIME (P48960)
**YOUNG & BASILE, P.C.**
3001 West Big Beaver Road
Suite 624
Troy, MI 48084-3107
(248) 649-3333

_Attorneys for Defendants ITT Industries
Inc. and ITT Automotive Inc._

STEPHEN L. SULZER
LISA E. MARKS
**DICKINSON WRIGHT PLLC**
1901 L Street, N.W., Suite 800
Washington, D.C. 20036-3506
(202) 457-0160

LAWRENCE G. CAMPBELL (P11553)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226-3425
(313) 223-3500

_Attorneys for Defendants TG North America
Corporation, TG Fluid Systems USA
Corporation, and A. Raymond, Inc._

---

### JOINT _MARKMAN_ BRIEF OF DEFENDANTS ITT INDUSTRIES INC., ITT AUTOMOTIVE INC., TG NORTH AMERICA CORPORATION, TG FLUID SYSTEMS USA CORPORATION, AND A. RAYMOND, INC.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................. ii

I. INTRODUCTION......................................................................... 1

II.  DEFENDANTS' PROPOSED CLAIM CONSTRUCTION................................. 2

III.  HISTORICAL CONTEXT............................................................... 4

IV.  PROSECUTION HISTORY............................................................. 6

V.  ARGUMENT............................................................................. 9

      A.  "Fuel Injection System Component"...................................... 12

      B.  "Electrically Conductive Fibers"......................................... 18

      C.  "A Conductive Member Leading to Said Electrical Plane"................... 21

      D.  "To Thereby Prevent . . . The Resultant Arcing"......................... 23

VI.  CONCLUSION......................................................................... 24

<u>**TABLE OF AUTHORITIES**</u>

**Page**

<u>**CASES**</u>

*Apple Computer, Inc. v. Articulate Sys., Inc.,*
    234 F.3d 14 (Fed. Cir. 2000)............................................................... 15, 16

*Bell Atlantic Network Servs., Inc. v.*
    *Covad Comms. Group, Inc.,*
    262 F.3d 1258 (Fed. Cir. 2001)............................................................ 10

*Crown Operations Int'l, Ltd. v. Solutia Inc.,*
    289 F.3d 1367 (Fed. Cir. 2002)............................................................ 15

*Ekchian v. Home Depot, Inc.,*
    104 F.3d 1299 (Fed. Cir. 1997)............................................................ 19

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
    535 U.S. 722, 122 S. Ct. 1831 (2002).................................................... 16

*In re Kaslow,* 707 F.2d 1366 (Fed. Cir. 1983).................................................... 13, 16

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
    175 F.3d 985 (Fed. Cir. 1999)............................................................. 11

*Karsten Mfg. Corp. v. Cleveland Golf Co.,*
    242 F.3d 1376 (Fed. Cir. 2001)............................................................ 9, 15

*Kopykake Enters., Inc. v. Lucks Co.,*
    264 F.3d 1377 (Fed. Cir. 2001)............................................................ 12

*Lockwood v. American Airlines, Inc.,*
    107 F.3d 1565 (Fed. Cir. 1997)............................................................ 16, 17,
    23

*Mantech Env. Corp. v. Hudson Env. Servs., Inc.,*
    152 F.3d 1368 (Fed. Cir. 1998)............................................................ 11, 12

*Martin v. Mayer,* 823 F.2d 500 (Fed. Cir. 1987)................................................. 17

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.,*
    298 F.3d 1290 (Fed. Cir. 2002), *cert.*
    *denied,* 537 U.S. 1232 (2003).............................................................. 16

*Northern Tel., Inc. v. Datapoint Corp.,*
    908 F.2d 931 (Fed. Cir. 1990),
    *cert. denied,* 498 U.S. 920 (1990)............................................................. 14

*Pitney Bowes, Inc. v. Hewlett-Packard Co.,*
    182 F.3d 1298 (Fed. Cir. 1999)............................................................. 11

*Plant Genetic Sys., N.V. v. Dekalb Genetics Corp.,*
    315 F.3d 1335 (Fed. Cir. 2003)............................................................. 11

*Scimed Life Sys., Inc. v. Advanced*
    *Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001)............................................................. 10, 18,
    19

*Scripps Clinic v. Genentech, Inc.,*
    927 F.2d 1565 (Fed. Cir. 1991)............................................................. 9

*Taylor v. Daimler Chrysler AG,*
    295 F. Supp.2d 729 (E.D. Mich. 2003)................................................... 10, 11

*Teleflex Inc. v. Ficosa North America Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002)............................................................. 9, 10,
    11

*Texas Digital Sys., Inc. v. Telegenix, Inc.,*
    308 F.3d 1193 (Fed. Cir. 2002),
    *cert. denied,* 123 S. Ct. 2230 (2003)..................................................... 10, 11

*Tronzo v. Biomet, Inc.,*
    156 F.3d 1154 (Fed. Cir. 1998)............................................................. 19

*Union Oil Co. of Cal. v. Atl. Richfield Co.,*
    208 F.3d 989 (Fed. Cir. 2000),
    *cert. denied,* 531 U.S. 1183 (2001)....................................................... 9

*Vas-cath Inc. v. Mahurkar,*
    935 F.2d 1555 (Fed. Cir. 1991)............................................................. 15, 16

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)............................................................. 10, 11

## <u>STATUTES</u>

35 U.S.C. § 101……………………………………………………………………………..   24

35 U.S.C. § 112……………………………………………………………………………   2, 15, 16, 18, 22, 23, 25

## <u>RULES</u>

37 C.F.R. § 1.67……………………………………………………………………… 13, 14

37 C.F.R. § 1.83……………………………………………………………………… 13, 22

## <u>OTHER AUTHORITIES</u>

Manual of Patent Examining Procedure 608.02(d)……………………………………....   13

Manual of Patent Examining Procedure § 608.04………………………………………....   14

Manual of Patent Examining Procedure § 704…………………………………………....   15

# I. INTRODUCTION

This is a patent case and the issue before the Court is the meaning of certain words in the paradigm claim for U.S. Patent No. 5,614,879 ("the '879 patent"). Defendants ITT Industries Inc., ITT Automotive Inc., TG North America Corporation, TG Fluid Systems USA Corporation, and A. Raymond, Inc. (collectively "Defendants") all join in this brief on the issue of claim construction, and in response to Plaintiff Honeywell International's *Markman* Brief Regarding U.S. Patent No. 5,614,879.

Honeywell's claim construction methodology can best be summarized as a "plain meaning, out-of-context" approach. By this approach, Honeywell urges the Court to extend the '879 patent claims to encompass quick connect couplings made with non-metal fibers, even though the patent is in all substantive ways limited to *fuel filters made with metal fibers*. Honeywell apparently premises its position on the Federal Circuit's admonition -- taken out of context -- to use the "plain meaning" of words in patent claims, and asks the Court to do so irrespective of the patentee's narrower definition and use of claim terms in the patent specification and prosecution history.

Defendants unanimously urge the Court to reject Honeywell's "plain meaning, out-of-context" approach for the following reasons:

1. The patent specification and prosecution history show that the inventors consistently used the terms at issue, and explicitly or implicitly defined those terms, in the same way as Defendants construe them here;

2. Honeywell's approach is not only legally incomplete, but is also directly at odds here with the *quid pro quo* principle that the exclusionary scope of a

patent claim cannot be greater than the inventors' contribution to the art; and

3.     The broad construction urged by Honeywell extends beyond the written description and, if adopted, would render the patent invalid under 35 U.S.C. § 112.

## II. DEFENDANTS' PROPOSED CLAIM CONSTRUCTION

All Defendants urge the Court to adopt the following constructions for the designated claim terms:

○ The phrase **"fuel injection system component [for communicating fuel to the engine of a motor vehicle]"** should be construed to mean **"fuel filter,"** because:

    (1) every reference in the specification to "the invention" is exclusive to a fuel filter;

    (2) there are no words or phrases in the patent expressly stating that fuel filters are merely *examples* of how the invention may be embodied; and

    (3) the problem solved by the invention is described in the patent as one which is exclusive to fuel filters.

○ The term **"electrically conductive fibers"** should be construed to mean **"metal fibers,"** because:

    (1) the patent specification makes clear that only metal fibers achieve the inventors' competing objectives of increasing conductivity while retaining the moldability of the base Nylon 12 material; and

(2) the patent specification expressly *disparages nonmetallic fillers*, including carbon black, carbon fiber, and other *nonmetallic* fillers, as being insufficiently conductive and too stiff to achieve the competing objectives of increasing conductivity while retaining moldability. The patentee's disparagement of *nonmetallic fillers* constitutes a disclaimer under prevailing Federal Circuit law.

o The phrase **"a conductive member leading to said electrical plane"** should be construed to mean **an electrically conductive bracket attached to, or molded as part of, the fuel filter housing**, because this is the only structure disclosed in the '879 specification, and the '879 specification describes this structure as essential to conduct electrons from fuel in the filter housing to the vehicle ground plane; and

o The phrase **"to thereby prevent the build-up of electrostatic charge in the fuel and the resultant arcing which causes the breakdown of the polymer material comprising the fuel injection system component"** defines the locus of the problem addressed by the invention -- *i.e.*, charge build-up in the *fuel* passing through *a fuel filter* -- and thereby supports Defendants' construction of "fuel injection system component" as a fuel filter.[1]

---

[1] The text of the only claim asserted by Plaintiff Honeywell -- *i.e.*, claim 1 of the patent-in-suit -- is set forth in its entirety at Exhibit A. A copy of the patent-in-suit, *i.e.*, U.S. Patent No. 5,164,879 ("the '879 patent"), and its reexamination certificate, are submitted as Exhibit B.

## III. HISTORICAL CONTEXT[2]

To ascertain the scope of the inventors' contribution to society, it is necessary to determine the scope and content of the art as of the filing date of the patent application that led to the '879 patent. Turning first to the discussion of the prior art in the '879 patent specification, it recognizes that the phenomenon of charge generation in hydrocarbon fuel systems was already well known and viewed as particularly troublesome with respect to fuel filters. (Exh. B, col. 1, lines 15-20, 30-35.) The inventors supported this statement by submitting with their application a publication dated July 2, 1969, entitled "Effective Conductivity on Charge Generation in Hydrocarbon Fuels Flowing Through Fiberglass Filters" (appended as Exh. C). That article states that the fuel filter constitutes a major source of charge separation in fuel handling systems and that evaluating the effect of hydrocarbon liquid on various filter materials is *essential.* (Exh. C at 283, col. 1, *see also* p. 288, col. 1.) The article goes on to say that the electrostatic build-up through delivery tubing (*i.e.,* fuel lines) is negligible. (*Id.* at 288.) The '879 inventors themselves confirm that resolving the static build-up in the filter is the key to solving the problem of electrostatic charge build-up in a fuel system. (Exh. B, col. 2, lines 30-47, 53-58.)

The inventors go on to disclose that electrostatic charge build-up was never a concern when fuel filters were made of metal. (Exh. B, col. 1, lines 30-35.) However, they explain that when the automotive industry switched from conductive metal to non-conductive plastic (*i.e.,* pure Nylon 12) filters and tubing, there was no pathway for the accumulated charge to travel to

---

[2]     At the technology tutorial on December 18, 2003, the Court requested a further presentation on the background and history of the problem addressed by the inventors in the patent-in-suit. Defendants' joint description of the history of the problem is set forth herein.

ground. (*Id.*, col. 1, lines 36-40.)[3] Thus, the challenge the Allied Signal inventors faced was to modify the existing plastic fuel filters it was already selling to solve the static charge accumulation problem. (*Id.*, col. 1, lines 13-44.) The Allied Signal inventors never addressed a need to modify or design any component other than their filters.

The problem of electrostatic charge generation and mitigation in all phases of fuel handling systems was thoroughly understood by the end of the 1970s. (*See* Declaration of Thomas G. Livernois, Ph.D. ¶¶ 7, 10, cited hereinafter as "Liv. Decl.") In addition, the Japanese had addressed the problem of static electricity in automotive plastic fuel filters as early as 1975. In July 1975, the Japanese Patent Office published Japanese Patent Application No. 50-U-77878 entitled "Fuel Filter." (Exh. D, (hereinafter "JP-77878") at p. 1.) JP-77878 describes the problem using words which appear to come directly from the '879 patent specification. (*See id.*, p. 2, lines 3-8.) The Japanese published application teaches forming the filter body (2) and the cap (3) that constitute the fuel filter housing (5) from a mixture of nylon resin and carbon fibers (*see* Exh. D, p. 3, lines 17-19), *i.e.*, the same basic material used by the ITT Defendants and Raymond to make quick connect couplings. The carbon fibers are added to the base nylon resin, as the Japanese application teaches, to reduce static electricity build-up.[4]

---

[3]     Allied Signal, the patent's original owner, was a major source of plastic automotive fuel filters by the mid-1980s. Except for the addition of metal fibers to the plastic, these same filters are sold by Honeywell today.

[4]     The Japanese application goes on to describe four examples of the nylon base material with increasing concentration of carbon fibers up to 15%. (*See* Exh. D, p. 4, line 8 – p. 5, line 7.) By way of a comparative graph (Figure 2), the Japanese application teaches that as the concentration of carbon fibers in the nylon base material increases from 0% (a) to 1% (b) to 5% (c) to 10% (d), and finally to 15% (e), the static electricity build-up is reduced.

Like the Japanese, the '879 inventors also proposed adding a conductive filler to the base nylon material used to mold the filter housing. However, unlike the Japanese application, the '879 inventors expressly rejected the use of carbon and carbon fibers because these materials acted unfavorably as stress concentrators, and at the relatively high filler loadings required to achieve conductivity, restrict the ability of the resin matrix to yield under stress. (Exh. B, col. 4, lines 1-5.) This is important because the inability of the resin matrix to yield under stress results in a more fragile housing, which is not suitable for the automotive environment. (*See* Liv. Decl. ¶ 32.) In the '879 specification, the inventors also taught that a carbon filled resin did not fulfill their express, competing objectives of making a housing that was electrically conductive while substantially retaining the moldability properties of the original nylon polymer material. (Exh. B, col. 3, lines 47-52, 55-59.) Accordingly, the '879 inventors proposed the use of *metal fibers* as the electrically conductive fillers, the preferred fiber being stainless steel, because such fibers satisfied these competing objectives. (*Id.*, col. 4, lines 1-16.)

The '879 inventors published two post-patent issuance SAE articles describing their solution to electrostatic charge build-up. Consistent with the '879 patent disclosure, only a fuel filter is discussed. (*See* Exhs. E, F.)

In sum, neither the historical development of the invention, nor the intrinsic record of the patent-in-suit and its related patents, supports the notion that the claim at issue broadly covers *any* fuel system component made of Nylon 12 mixed with *any* conductive fiber.

## IV. PROSECUTION HISTORY

The prosecution history of the '879 patent began on August 30, 1990, when the inventors filed application Serial No. 575,260 (Exh. G at V., tab 1), the parent application of the patent-in-

suit, entitled "ELECTROSTATICALLY DISSIPATIVE FUEL FILTER." The abstract of that application read as follows:

> A *fuel filter* for a motor vehicle includes a housing made of a base Nylon 12 material to which are added *stainless steel fibers* to render the housing electrically conductive while retaining moldability. The electrically conductive housing permits charges generated by the *fuel passing through the filtering media* to be dissipated to the vehicle body, thereby preventing erosion of the housing and subsequent leaks. (Exh. G at V., tab 1, p. 11 (emphasis added).)

The entire specification of the '879 patent is dedicated to discussion of fuel filters and the need to increase conductivity of the base molding material while at the same time retaining its moldability and other physical properties. The original application contained (a) a single drawing showing a stand-alone fuel filter not connected to anything else in a fuel system (*id.* at V., tab 1, p. 12); and (b) a specification explaining that the static discharge problem was unique to the use of plastic fuel filters in automobiles with fuel injection systems. (*Id.* at V., tab 1, pp. 1-11.)

The original application contained twenty claims arranged in three groups defining three different aspects of the alleged invention: ten claims drawn to a method of making fuel filters with plastic housings; six claims drawn to a fuel filter with a plastic housing; and four claims drawn to a molding material capable of use in manufacturing fuel system components. (*Id.* at V., tab 1, pp. 8-10.) As a result of this discrete grouping of claims, the original application was "divided" into three separate applications for examination. The claims to the method of constructing fuel filters with plastic housings were retained in the original application (*id.* at V., tab 1, p. 8) and ultimately issued in U.S. Patent 5,076,920. (*Id.* at V.) It is important to note that the claims of that patent, which are specific to the construction of a fuel filter, are not asserted in this litigation. The article claims went into a divisional application (*id.* at III., tab 1, p. 10) that ultimately issued as U.S. Patent No. 5,164,084. (*Id.* at III.) Again, those article claims are too

narrow to assert against quick connect couplings.  Finally, the claims to the molding material

went into a second divisional application, bearing Serial No. 07/724,240 (*id.* at I., tab 3, p. 10),

and eventually became the '879 patent-in-suit, but only after a significant change in course.

While the application that led to the '879 patent was pending, all of the claims drawn to a

*molding material* were abandoned and replaced by a set of claims drawn to a fuel system com-

ponent *per se.*  (*Id.* at I., tab 9, pp. 1-3.)  In addition, the title and abstract were modified from the

original form quoted above.  This amendment constituted a significant change in course from the

original molding material claims but, contrary to 37 C.F.R. § 1.67, this change was never vali-

dated by the Allied Signal inventors as one which was consistent with their disclosed invention.

The '879 patent issued on November 17, 1992, with a single independent claim and three

dependent claims.  (*See* Exh. B.)  Five years later, a third party filed a request to reexamine the

'879 patent in view of prior art which had not been considered during prosecution of the appli-

cation that led to the '879 patent.  (Exhibit H.)  The new prior art consisted of published Japanese

patent applications (JP 77878 (Exhibit D) and JP 8102 (Exhibit I)), which disclose, respectively,

addition of conductive filler to the molding material used to mold a filter housing to minimize

charge accumulation, and oil filter media with embedded carbon black to dissipate charge.

As prior art disclosing a fuel filter made from nylon resin containing carbon fibers, JP-

77878 literally tore the heart out of the '879 patent.  On May 1, 1997, the Patent Office granted

the reexamination petition (Exh. G at II., tab 2), and subsequently rejected all four of the original

'879 patent claims on the basis that they failed to meet patentability requirements in view of this

new prior art.  (*Id.* at II., tab 2, pp. 2-3.)  In response, Allied Signal's attorneys argued two

premises to overcome the head-on rejection:  (1) that the fuel filter of JP-77878 was intended for

use with *carbureted* engines, whereas the filter in the reexamined patent was for use with fuel injected engines; and (2) that JP 8102 (and JP 63-54859) failed to teach mounting the filter in an automobile by means of a conductive bracket. (*Id.* at II, tab 4, pp. 6-12.)[5]

## V. ARGUMENT

Claim interpretation begins with analysis of the words of the claim, but the analysis does not end there. *E.g., Teleflex Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002).[6] The words of the claim are construed independent of the accused product, in light of the specification, the prosecution history, and the prior art, *e.g., Union Oil Co. of Cal. v. Atl. Richfield Co.*, 208 F.3d 989, 995 (Fed. Cir. 2000), *cert. denied*, 531 U.S. 1183 (2001), quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991), always remaining within the statutory framework of Title 35 of the United States Code. *See, e.g., Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1384 (Fed. Cir. 2001) ("Claims amenable to more than one construction should, *when it is reasonably possible to do so*, be construed to preserve their validity.") (emphasis added).

Honeywell takes the approach that the Court should give the claim terms their ordinary and accustomed meaning, but in a contextual vacuum, *without reference to the patent specification, the prosecution history, or the prior art*. Honeywell's approach is clearly wrong.

---

[5] The basis for the first premise is as yet unknown. There is no reference to carburated engines in JP-77878. Moreover, Allied Signal's unfounded representation regarding the end use of the JP-77878 filter only in a carburated system is contradicted by the '879 patent's specification, which states that the static discharge problem addressed by the invention occurs in fuel injection systems, but *not* in carburated systems. (Exh. B, col. 1, lines 10-25.)

[6] Copies of all cited cases, statutes, regulations, and manuals have been provided concurrently herewith in a separate appendix.

- 9 -

The Federal Circuit (and the person of ordinary skill interpreting the claims) always looks to the patent specification and the prosecution history to determine whether the patentee has narrowed a claim term's ordinary meaning, because the patentee may have acted as his own lexicographer and given the claim terms a particular meaning, or may have disclaimed scope of coverage. *E.g., Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002), *cert. denied,* 123 S. Ct. 2230 (2003); *Teleflex,* 299 F.3d at 1324-25.

The ordinary and accustomed meaning of a claim term does not apply where the patentee has redefined the term in the intrinsic record, or has characterized the invention using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. *E.g., Teleflex,* 299 F.3d at 1325, citing *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). Even if a claim term is not defined in explicit definitional format, "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *E.g., Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001), quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The patent specification may also limit the scope of the claims by resolving an ambiguity where the ordinary and accustomed meaning of the words used in the claims lacks sufficient clarity to permit the scope of the claims to be determined from the words of the claims alone. *Teleflex,* 299 F.3d at 1325; *Bell Atl. Network Servs.*, 262 F.3d at 1268. Among the intrinsic evidence, the specification is always highly relevant to the claim construction analysis. *Teleflex,* 299 F.3d at 1325; *Vitronics,* 90 F.3d at 1582; *Taylor v. Daimler Chrysler AG,* 295 F. Supp.2d 729, 735 (E.D. Mich. 2003). The Federal Circuit has observed that "[u]sually, [the specification]

is dispositive; it is the single best guide to the meaning of a disputed term." *Teleflex*, 299 F.3d at 1325, *quoting Vitronics*, 90 F.3d at 1582; *Taylor*, 295 F. Supp.2d at 735.

Until its 1999 ruling in *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999), the Federal Circuit held that extrinsic evidence (such as expert testimony interpreting a claim term) could not be relied upon, unless the intrinsic evidence would not resolve an ambiguity in claim language. *E.g., Vitronics*, 90 F.3d at 1583; *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). In *Pitney Bowes*, the Federal Circuit held that "*Vitronics* does not prohibit courts from examining extrinsic evidence, even when the patent document is itself clear." *Pitney Bowes*, 182 F.3d at 1308. *Accord, Plant Genetic Sys., N.V. v. Dekalb Genetics Corp.*, 315 F.3d 1335, 1346 (Fed. Cir. 2003).[7] In *Texas Digital Systems*, the Federal Circuit further explained that "extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict claim language." *Texas Digital Sys.*, 308 F.3d at 1212. *See also Mantech Env. Corp. v. Hudson Env. Servs., Inc.*, 152 F.3d 1368, 1373 (Fed. Cir. 1998)

---

[7]     The Federal Circuit explained in *Pitney Bowes*:

> Under *Vitronics*, it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field. This is especially the case with respect to technical terms, as opposed to non-technical terms in general usage . . . . Although the patent file may often be sufficient to . . . interpret the technical aspects of the patent properly, consultation of extrinsic evidence is particularly appropriate to ensure that [the Court's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art.

*Pitney Bowes*, 182 F.3d at 1309.

(district court was correct in both admitting and accepting expert testimony for purpose of background in the technology, and then basing its claim construction solely upon intrinsic evidence).[8]

## A. "Fuel Injection System Component"

The specification and the prosecution history of the '879 patent make clear that the phrase "fuel injection system component for communicating fuel to the engine of a motor vehicle" must be construed to mean a fuel filter, because (i) a fuel filter is the only "component" described as "the invention" in the '879 specification, and nothing in the patent indicates that this description of the fuel filter is merely exemplary; and (ii) the fuel filter is the only fuel system component that is described as having a static build-up problem severe enough to require remediation.

In proposing its "plain meaning, out-of-context" claim construction, Honeywell argues that "*nothing* in the . . . patent specification suggests that the word 'component' should be construed to mean only fuel filter . . . ." (Hon. Op. Br. at 1.) On the contrary, *everything* in the specification suggests that the inventors only invented a fuel filter, *e.g.*:

> *This invention relates to a fuel filter* for use in the fuel line that delivers fuel to a motor vehicle engine. (Exh. B, col. 1, lines 8-9 (emphasis added).)

> *According to the present invention, a fuel filter for a motor vehicle is made from a moldable material* . . . . This and other advantages of *the present invention* will become apparent from the following description, with reference to the accompanying drawing, *the sole Figure of which is a cross-sectional view of a fuel filter* made pursuant to the teachings of the present invention and its attachment to an associated automotive body. (*Id.* at col. 1, lines 40-49 (emphasis added).)

> *According to the present invention,* an electrically conductive path is provided between the fuel within the inlet cavity 42 and the body 38 [of the filter]. (*Id.* at col. 3, lines 41-44 (emphasis added).)

---

[8]  Absent proof of an earlier invention date, the meaning of a claim will be determined as of the filing date of the patent application. *E.g., Kopykake Enters., Inc. v. Lucks Co.,* 264 F.3d 1377, 1383 (Fed. Cir. 2001).

Moreover, the description of the *problem* is exclusive to filtering:

As the fuel communicates through the [filter] media 20 from inlet cavity 42 to the inner or outlet cavity 28, electrical charges are generated, regardless of the type of media used. . . . Thus the fuel in the inlet cavity 42 becomes negatively charged. *Although some electrical charge generation occurs in the fuel lines upstream and downstream of the filter due to stripping of electrons due to friction between the fuel and the walls of the fuel line, the charge generation due to the impact of the hydrocarbon paraffin against the [filter] media 20 may be as much as several orders of magnitude higher than the generation taking place in the lines themselves.* (*Id.* at col. 2, lines 26-47 (emphasis added).)

37 C.F.R. § 1.83, entitled "Content of drawing," requires a patent drawing to show "every feature of the invention specified in the claims."[9]  The drawings indisputably omit any showing, even in schematic form, of fuel lines, quick connect couplings, or other fuel system components. The intrinsic record, including the inventors' original disclosure, shows that both the problems confronted by the inventors and the solution they conceived were unique to, and targeted at, *fuel filters, and fuel filters alone.*

The prosecution history of the '879 patent and its reexamination certificate also show that the inventors' discovery is limited to fuel filters. The genericized claims filed in June 1991 and the genericized abstract filed at the same time were the product of creative patent attorneys and were never supported by an *essential* supplemental declaration of the inventors as required by 37 C.F.R. § 1.67. There were no changes to the originally filed patent specification to give any notice that the invention could be used in other components such as quick connect couplings or hoses, which this Court knows, after the technology tutorial, bear no physical or functional resemblance to fuel filters. Most telling of all, the specification mentions a "fuel line" at column

----

[9]     *See also* Manual of Patent Examining Procedure 608.02(d); *In re Kaslow*, 707 F.2d 1366, 1375 (Fed. Cir. 1983) (drawings may be considered in determining compliance with written description requirement).

1, lines 59-60, but teaches that "[t]he fuel line may also be made of a non-conductive material." Thus, if anything, the specification actually teaches *away* from making secondary plastic fuel system components conductive.

As part of the parent filing, the original claims, which recited a molding material intended for use in fuel system components, form part of the original disclosure.[10] However, they do not, in and of themselves, describe the other fuel system *components*, as would be required to support Honeywell's all-encompassing, out-of-context interpretation of the term "component." Moreover, there was never any amendment made to the patent specification to suggest that the phenomenon of charge accumulation and arcing through the wall of a plastic component occurred in anything other than a component having *a filter medium*. There were two good reasons why the specification was never so amended: (1) it would have introduced "new matter" after the application had already been filed, which the patent regulations expressly forbid (37 C.F.R. § 1.67); and (2) the inventors' discovery did not extend to such subject matter.[11]

Honeywell relies heavily on a conclusory assertion made by the applicant's counsel during prosecution of the application that led to the '879 patent (Hon. Op. Br. at 6), that the term "component" is broad enough to cover *all* fuel system components made of the material disclosed in the specification. (Exh. G at I., tab 9, p. 3 (Response to Office Action dated September 25, 1991).) However, this self-serving, conclusory statement does not supply the fatally missing

---

[10]     *Northern Tel., Inc. v. Datapoint Corp.*, 908 F.2d 931, 938 (Fed. Cir. 1990), *cert. denied,* 498 U.S. 920 (1990); MPEP § 608.04.

[11]     There is extrinsic evidence supporting this; in 1991 and 1992, two of the inventors submitted a paper to Polymers Technical Exchange Conference in Morristown, New Jersey (Exh. E (H014552-H014553)) and the Society of the Plastics Industry, Inc. (Exh. F (H014534-H014535)) describing their fuel filter and only the fuel filter.

disclosure, and cannot overcome the deficiencies in the patent's written description of the invention, which do not support a broad construction of the term "component."[12]

If Honeywell is correct that the terminology "fuel injection system component" must mean *any* component, including, for example, quick connect couplings and hoses, claim 1 does not meet the requirements of 35 U.S.C. § 112. Section 112 imposes express statutory limitations on the scope of patent claims, stating that "[t]he specification shall contain a written description of the invention . . . in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ." 35 U.S.C. § 112, ¶ 1. This provision embodies two separate and distinct requirements - written description and enablement. *E.g., Vas-cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991); *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1379 (Fed. Cir. 2002). If the "fuel injection system component" phrase in claim 1 were not limited to a fuel filter, claim 1 would be invalid for lack of an adequate written description in the specification and lack of an enabling disclosure.[13]

---

[12]     Honeywell also makes much of the examiner's conclusion in the application that led to the related '084 patent that claims directed to a filter fall into different classifications than those directed to components.   (Hon. Op. Br. at 6-7.)   That examiner stated that fuel system components fell within class 123, while filters were within class 210.   Honeywell relies on this distinction to support its contention that "component" cannot be limited to a filter.  However, the examiner assigned to the application that led to the '879 patent-in-suit, presumably following the mandate of the Manual of Patent Examining Procedure, read the '879 specification and claims, and then searched filters (210) and polymers (361).   (*See* MPEP § 704.)   This can lead to only one conclusion    he never searched the fuel components class (123) because he read the disclosure to be limited to fuel filters.

[13]     There is a tension between the principles of claim construction relating to preserving the validity of a claim.   *Compare, e.g., Karsten Mfg.*, 242 F.3d at 1384 ("[c]laims amenable to more than one construction should, when it is reasonably possible to do so, be construed to preserve their validity."), *with, e.g., Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 24 (Fed. Cir. 2000) ("[w]here the only claim construction that is consistent with the claim's language and Footnote continued on next page ...

- 15 -

The written description requirement of Section 112 in essence codifies the requirements of the social contract between the government and the applicant and imposes the ultimate statutory limitation on patent claims, *i.e.*, the claims cannot validly exceed the scope of the inventors' contribution to the art as disclosed in the specification. *E.g.*, *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1232 (2003). The written description requirement calls for a patent disclosure to "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, [the patentee] was in possession *of the invention*." *Vas-cath*, 935 F.2d at 1563-64; *Kaslow*, 707 F.2d at 1375. As the Supreme Court held in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736, 122 S. Ct. 1831, 1840 (2002), "[w]hat is claimed by the patent application must be the same as what is disclosed in the specification; otherwise the patent should not issue." Thus, the specification must show that the patentee invented each feature that is included as a claim limitation. *E.g.*, *New Railhead Mfg.*, 298 F.3d at 1295.

Any suggestion by Honeywell that it would have been obvious to take the '879 disclosure and modify its teachings to make some other conductive fuel system component does not satisfy the written description requirement under prevailing Federal Circuit law. As the Federal Circuit pointed out in *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997), a patent does not meet the written description requirement merely because it would have been obvious for a person of ordinary skill to modify the disclosed subject matter to make a particular device:

---

Continued from previous page ...
the written description renders the claim invalid, then the [foregoing] axiom does not apply and the claim is simply invalid.").

> Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed. It extends only to that which is disclosed. While the meaning of terms, phrases, or diagrams in a disclosure is to be . . . interpreted from the vantage point of one skilled in the art, all the limitations must appear in the specification. The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, [the] application itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.

107 F.3d at 1571-72 (citations omitted, emphasis in original).[14]  This standard is not met by the '879 patent's specification or its file history, which are devoid of text describing, or drawings showing, any components other than a fuel filter.

Just as a patent attorney's *ex post facto* remarks cannot cure deficiencies in the original disclosure, neither can those of Honeywell's expert, Mr. Brandt. Indeed, Mr. Brandt's declaration should not be given any weight at all, for at least four reasons. *First*, Mr. Brandt does not establish the level of ordinary skill, or define the pertinent art, both needed for the construction of claim terminology. *Second*, he speaks to the meaning of claim terms only from his own personal understanding, instead of from the viewpoint of the person of ordinary skill, contrary to well-settled legal principles. *Third*, he does not address the meaning of claim terms as of the filing date of the patent application. *Fourth*, and most telling, Brandt does not address the glaring deficiencies in the specification and the file history. For example, with respect to the

---

[14]     *See also Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987) (it is "not a question of whether one skilled in the art *might* be able to construct the patentee's [claimed] device from the teachings of the disclosure. . . .  Rather, it is a question whether the application necessarily discloses that particular device.").

"component" term, Mr. Brandt fails to address the specification's and the file history's complete lack of description of any component other than a fuel filter in the context of the invention.[15]

In contrast, the Declaration of Defendants' expert, Dr. Thomas Livernois, makes clear that a person of ordinary skill in the art would understand the '879 patent specification to only disclose a fuel filter. (Liv. Decl. ¶¶ 17, 28-30.) Thus, even if the plain meaning of the generic terminology "fuel injection system component", taken out of context, could be construed broadly to cover any fuel injection system component, when it is read in the context of the '879 specification -- as it must be under the law   this phrase can mean only one thing, a fuel filter. To find otherwise would invalidate claim 1 for failure to comply with Section 112 and the basic framework for the social contract that it represents.[16]

## B.   "Electrically Conductive Fibers"

The phrase **"electrically conductive fibers"** means **"metal fibers"** because:

(1) the '879 specification teaches that only *metal fibers* meet the inventors' competing objectives of increasing conductivity while retaining the moldability of the base nylon 12 material; and

(2) the '879 patent specification expressly *disparages, and thereby disclaims, nonmetallic filler,* including carbon black, carbon fiber, and other nonmetallic

---

[15]   At the very least, Mr. Brandt's declaration would have to establish that a person of ordinary skill in the art could rely on the disclosure for guidance in making any fuel system component. His declaration does not make such far-reaching assertions, because they would be unsustainable, at the very least, with respect to quick connect couplings and fuel line hoses.

[16]   The Livernois Declaration also makes clear that the phrase "fuel injection system component for communicating fuel *to the engine* of a motor vehicle", by its plain language, cannot encompass components that communicate fuel *from* the engine back to the fuel tank. (Liv. Decl. ¶ 31.)

fillers, as being insufficiently conductive and too stiff to meet the competing

objectives of increasing conductivity while retaining moldability.

The Federal Circuit made clear in *Scimed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1341-43 (Fed. Cir. 2001), that where a patent specification expressly criticizes the properties of the prior art, it disclaims coverage of the criticized subject matter, even if absent the disclaimer the claims could have been construed to cover the criticized subject matter. The *Scimed* Court explained that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Scimed*, 242 F.3d at 1341. The *Scimed* Court added: "[B]y distinguishing the claimed invention over the prior art[,] an applicant is indicating what the claims do not cover, [and] is by implication surrendering such protection." *Id.* at 1343, quoting *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997). As here, the applicant's discussion of the disadvantages of various prior art structures and the advantages of the claimed subject matter supported the conclusion that the claims should not be read to encompass the distinguished prior art structure. *Id.* at 1342-43.[17]

Under *Scimed*, regardless of the apparent breadth of the "electrically conductive fibers" claim language, that phrase cannot be construed to cover a fuel system component that includes a nonmetallic filler, such as carbon fibers. The '879 patent specification clearly distinguishes

---

[17]     *See also Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1159 (Fed. Cir. 1998) (specification distinguished prior art as inferior and touted advantages of a conical shaped cup for artificial hip device; court held that specification would not support claims drawn to all cup shapes because "[s]uch statements make clear that the . . . patent discloses *only* conical shaped cups and nothing broader.").

between metallic filler and nonmetallic filler such as carbon. It does not, as Plaintiffs argue, pre-

sent steel fibers and carbon fibers as acceptable alternatives. To the contrary, the specification

clearly *disparages* the use of carbon fibers as insufficiently conductive and excessively stiff:

> Since the filler material must be chemically resistant to the fuel in the housing 12,
> a filamentary stainless steel fiber product with a high aspect ratio was selected as
> the filler material. *Stainless steel also has the advantage of requiring smaller
> quantities for providing the required conductivity than other conductive fillers,
> such as carbon black,* metal flakes and powders, and metallized microspheres
> which possess small aspect ratios. (Exh. B, col. 3, lines 52-59.)

> *Other electrically conductive fillers, such as the aforementioned carbon, act as
> stress concentrators and, at the relatively high filler loadings required to
> achieve conductivity, restrict the ability of the resin matrix to yield under stress.
> Also, the stainless steel fibers are ductile and non-rigid unlike straight or
> metallized carbon fibers or metallized inorganic fibers and whiskers.* This
> allows stainless steel fibers to maintain their integrity better during melt-
> processing. *Unlike the non-metallic fibers, stainless steel fibers also do not
> increase mechanical strength or stiffness of the base resin significantly.*

(*Id.* at col. 4, lines 1-12 (emphasis added).) Together with this disclaimer of nonmetallic fillers,

the intended scope of the language "electrically conductive fibers" is made perfectly clear by the

following statement: *"Other **metal** fibers with high aspect ratios can be satisfactorily

substituted for stainless steel."* (*Id.* at col. 4, lines 12-13 (emphasis added).)[18]

One of ordinary skill in the art reading this disclosure in the '879 specification would

understand the term "electrically conductive fibers" to mean metal fibers, because it is only metal

fibers that enabled the inventors to meet the competing objectives of increasing conductivity

while retaining moldability. (Liv. Decl. ¶ 32.) As shown above, Honeywell expressly

---

[18]     Honeywell's assertion that Defendants are improperly reading the preferred embodiment
into the claims is manifestly wrong. The claims must be construed in light of the specification
which, as shown above, defines the invention to encompass more than just the preferred stainless
steel – *i.e.,* to encompass all *metal* fibers *with high aspect ratios.*

disclaimed the use of nonmetallic filler in the written description of the invention.[19]  Honeywell may not recapture, by its "plain meaning, out-of-context" claim interpretation, the subject matter it disclaimed, and, therefore, the phrase "electrically conductive fiber" should be construed to mean only *metal fibers.*

### C.   "A Conductive Member Leading to Said Electrical Plane"

**"A conductive member leading to said electrical plane" means an electrically conductive bracket directly attached to, or molded as a part of, the fuel filter housing,** because the '879 specification describes this as an essential element needed to conduct electrons from fuel in the filter housing to the vehicle ground plane, where the pathway to ground formerly provided by metal tubing has been removed by the use of tubing made of non-conductive material.

Providing a path to ground from the fuel filter housing through the metal or integrally molded bracket was considered by the inventors to be essential to solving part of the problem described in the '879 patent; namely, "with non-conductive systems in which both the tubing and the filter are made from a non-conductive material, the pathway has been removed, leaving no way for the charges to drain to ground." (Exh. B, col. 1, lines 36-39.)  Without a metal or integrally molded bracket that is a part of, or is attached directly to, the housing of the claimed fuel filter, the problem is simply not solved in its entirety.  As shown by the Livernois Declaration, a person of ordinary skill in the art would readily understand the written description to require that the claimed "conductive member leading to said electrical plane" be a bracket

---

[19]     Mr. Brandt's declaration not only fails to address what is clearly missing from the '879 specification, *i.e.,* support for a broad interpretation of the term "component," it also fails to address what is clearly present in the '879 specification, *i.e.,* the inventors' express teaching away from the use of nonmetallic conductive fillers such as carbon.

which is "either a separate metallic member *attached to the housing 12 or molded as a part of the housing 12* from the same material used for the housing 12." (Liv. Decl. ¶ 33; Exh. B, col. 2, lines 16-19 (emphasis added).)  The specification discloses no alternative structures or locations for the conductive member, nor does the specification identify a conductive member as optional. (Liv. Decl. ¶ 34.)  However, the '879 patent does teach that, because the fuel filter housing itself has this metal or integrally-molded conductive bracket for providing a pathway to ground, the fuel lines connected to the filter need not be conductive.  (*Id.* ¶ 34; Exh. B, at col. 1, lines 59-60.)

The inventors' suggestion that non-conductive fuel lines could be used with the fuel filter could only have been possible if the inventors provided a way to ensure that any electrical charges would have a pathway to ground.  (*See* Liv. Decl. ¶ 34.)  That assurance came from the provision of an electrically conductive grounding bracket as an integral part of the fuel filter's housing, or by attaching one end of the grounding bracket directly to the fuel filter's housing, and attaching the other end to the vehicle.  (*See id.* ¶¶ 33-34.)  The specification and the file history lack any description or drawing of any other arrangement or thing that provides this function.[20] Thus, the patent document does not meet the written description or enablement requirements of Section 112 if the "conductive member" term is construed as broadly as Honeywell requests.[21]

---

[20]     In addition to being an essential part of the claimed invention from a functional perspective, 37 C.F.R. § 1.83(a) requires a drawing to show "every feature of the invention specified in the claims."  The drawings fail to illustrate any fuel lines, quick connect couplings, or other fuel system components that could serve as the conductive member capable of conducting electrical charge from the fuel filter housing to the vehicle ground.  If Honeywell intended to claim fuel lines and quick connect couplings as such members, it would have done so and would have supported such claims with appropriate drawings.

[21]     Moreover, as with the "fuel injection system component" terminology of claim 1, any suggestion by Honeywell that it would have been obvious to take the written description of the Footnote continued on next page ...

As with the "component" terminology, even if the term "conductive member" could be construed as broadly as Honeywell urges under its plain meaning, out-of-context methodology, claim 1 would be invalid for failure to comply with the requirements of Section 112.[22] Accordingly, the conductive member should be construed to mean an electrically conductive bracket that is directly attached to, or molded as an integral part of, the housing of the claimed device.

## D.    "To Thereby Prevent . . . The Resultant Arcing"

The phrase "to thereby prevent the build-up of electrostatic charge in the fuel and the resultant arcing which causes the breakdown of the polymer material comprising the fuel injection system component," construed in light of the specification, further supports Defendants' assertion that the "fuel injection system component" terminology of claim 1 must mean a fuel filter. The written description of the invention describes the arc discharge and resulting pinhole problem at the interior of a filter housing containing the filter media. There is no mention that

_____

Continued from previous page ...

'879 patent and modify its teachings to attach a conductive bracket or member in any position other than directly to the housing of the disclosed filter will not satisfy the written description requirement. *Lockwood* makes clear that the '879 specification fails to satisfy the written description requirement with respect to Honeywell's broad interpretation of the conductive member limitation, even if it would have been obvious for a person of ordinary skill to attach the conductive bracket to some location other than directly to the housing of the disclosed filter. 107 F.3d at 1572.

22    Here again, Mr. Brandt's declaration fails to address what is plainly lacking in the specification – in this instance, disclosure of any conductive member that is not attached to, or molded as a part of, a filter housing. Instead, Mr. Brandt ignores the express language of the specification, as well as the only patent drawing defining the location of the conductive member.

this problem occurs in another fuel system component.  As Dr. Livernois makes clear, the problem of charge build-up in the fuel handling system is unique to filters.  (Liv. Decl. ¶¶ 17, 35.)[23]

Additionally, at the technology tutorial, every party presented evidence from the Society of Automotive Engineers ("SAE") showing that the fuel filter is the "culprit" in the static discharge problem.[24]  Substantially all of the literature and scientific evidence indicates that a charge accumulation/arcing problem in an all-plastic automotive fuel system is uniquely located in the interior of the *fuel filter*; therefore, a construction that "fuel injection system component" means "fuel filter" is also mandated by the utility provisions of 35 U.S.C. § 101.

## VI.  CONCLUSION

Defendants do not dispute that the claim terms "fuel injection system component," "conductive fibers," and "conductive member," when removed from the context of the '879 patent specification, file history, and prior art, appear to be broad terms encompassing many possibilities.  However, Honeywell's "plain meaning, out-of-context" approach ignores companion legal principles, and does not apply because it would expand the exclusionary rights defined by the claims well beyond the actual invention.  The "*quid pro quo*" for the exclusionary right of the patent grant is a contribution of commensurate scope to the body of public knowledge.

---

[23]     Mr. Brandt's declaration again fails to address the failure of the specification to describe the occurrence of this arcing problem in any fuel system component other than a fuel filter.

[24]     Indeed, as pointed out in note 11 *supra*, in 1991 and 1992, two of the inventors submitted a paper to Polymers Technical Exchange Conference in Morristown, New Jersey and the Society of the Plastics Industry, Inc., explaining the charge accumulation phenomenon as one which is substantially produced by a *filter media*.  (Exh. E at H014553; Exh. F at H014535.)  *See also* Declaration Under 37 C.F.R. § 1.132, submitted by the first-named inventor of the patent-in-suit, Daniel R. Danowski, during prosecution of the reexamination of U.S. Patent No. 5,164,084, explaining that during testing, the arcing problem only occurred in the filter.  (Exh. J.)

In the instant case, there is strong evidence in the prior art and the intrinsic record that the inventors' contribution to the body of public knowledge was the solution of a static charge problem uniquely found in plastic fuel filters, by adding metal fibers to the plastic from which the filters and integral brackets were formed. This is the clear message of the written description and the file history, and is far narrower than the result reached by Honeywell's "plain meaning, out-of-context" approach. Honeywell's construction is reached only by reading the claims in a vacuum, which flies in the face of prevailing Federal Circuit case law. For the foregoing reasons, Defendants' claim construction should be adopted, and the claims limited to fuel filters made of a nylon molding material containing electrically conductive metal fibers and mounted in an automobile by way of an electrically conductive bracket that is integral to, or directly attached to, the fuel filter's housing. Alternatively, claim 1 should be declared invalid under 35 U.S.C. § 112.

Respectfully submitted,

Thomas N. Young (P22656)
Amanda Conti Duhaime (P48960)
**YOUNG & BASILE, P.C.**
3001 West Big Beaver Road
Suite 624
Troy, MI 48084-3107
(248) 594-6800

*Attorneys for Defendants ITT*
*Industries Inc. and ITT Automotive Inc.*

Stephen L. Sulzer
Lisa E. Marks
**DICKINSON WRIGHT PLLC**
1901 L. Street, N.W., Suite 800
Washington, D.C.  20036-3506
(202) 457-0160

Lawrence G. Campbell (P11553)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226-3425
(313) 223-3500

*Attorneys for Defendants TG North*
*America Corporation, TG Fluid Systems*
*USA Corporation, and A. Raymond, Inc.*

Date:  March 10, 2004

- 25 -

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

HONEYWELL INTERNATIONAL
INC., *et al.,*

     *Plaintiffs,*

                        HONORABLE AVERN COHN

v.                        CASE NO. 02-73948

ITT INDUSTRIES, INC., *et al.,*

     *Defendants.*

_____/

## CERTIFICATE OF SERVICE

I, Lisa E. Marks, hereby certify that on March 9, 2004, a copy of the foregoing Joint

*Markman* Brief of Defendants ITT Industries Inc., ITT Automotive Inc., TG North America

Corporation, TG Fluid Systems USA Corporation, and A. Raymond, Inc. was served via Federal

Express, second day delivery, upon the following parties:

For Plaintiffs Honeywell International Inc.
and Honeywell Intellectual Properties Inc.

R. Terrance Rader, Esq.
RADER, FISHMAN & GRAUER PLLC
39533 Woodward Avenue, Suite 140
Bloomfield Hills, Michigan 48304

                              _____
                                    Lisa E. Marks